UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

JEFFERY L. WILFORD,

    Plaintiff,

v.                                                                  07-CV-3116

STEVEN BRYANT,
DR. FRANCIS KAYIRA,
WEXFORD HEALTH SOURCES, INC.,
and ROGER LEIGH,[1]

    Defendants.

### Order Granting and Denying Summary Judgment

    Plaintiff alleges that Defendants failed to timely diagnose and fix his broken wrist during his incarceration in Graham Correctional Center in 2005-06.  The defendants' motions for summary judgment are before the court.  For the reasons below, summary judgment will be granted to Defendants Wexford Healths Sources Inc., and Roger Leigh, the x-ray technician.  Summary judgment will be denied as to Defendant Dr. Kayira, the treating physician, and Defendant Bryant, Graham's Warden at the relevant time.

### Standard

    A party moving for summary judgment must show, from the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, . . ." that there is no genuine issue of material fact and that the "moving party is entitled to judgment as a matter of law.  *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001), *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986);Fed. R. Civ. P.56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Herman v. National Broadcasting Co., Inc.*, 744 F.2d 604, 607 (7th Cir. 1984), *cert. denied*, 470 U.S. 1028 (1985).  This burden can be satisfied by "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.  If such a showing is made, the burden shifts to the non-movant to "set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); *Outlaw*, 259 F.3d at 837.  A nonmoving party cannot rest on its pleadings, but must demonstrate that there is admissible evidence that will support its position.  *Tolle v. Carroll Touch, Inc.,* 23 F.3d 174, 178 (7th Cir. 1994).  In determining whether factual issues exist, the court must view all the evidence in the light most favorable to the non-moving party.  *Beraha v. Baxter Health Corp.*,

---

[1]Defendants IDOC and Walker were dismissed in prior orders.

1

956 F.2d 1436, 1440 (7th Cir. 1992).

## Undisputed Facts

1. Dr. Kayira is currently the Medical Director at the Graham Correctional Center was serving in that capacity at all relevant times. He is board certified in radiology.

2. From November 2004 through July 4, 2005, Dr. Kayira was employed by Wexford Health Sources. From July 5, 2005 through December 16, 2005, Dr. Kayira's employer was Health Professionals Ltd. From December 17, 2005, to the present, Dr. Kayira's employer has been Wexford.

3. In March 2005, before the plaintiff's incarceration, the plaintiff had surgery on his right forearm to correct a fracture, which required the insertion of hardware. Dr. Karolyn Senica performed the surgery at St. Johns Hospital in Springfield, Illinois.

3. The plaintiff began his incarceration at Graham in July 2005.

4. On or about August 15, 2005, the plaintiff fell, trying to climb up on his bunk, re-injuring his right arm/wrist where the surgery had been. The plaintiff spent the night in the infirmary and saw Defendant Dr. Kayira the next morning.

5. Dr. Kayira examined the plaintiff on August 16, 2005 and ordered x-rays. The x-ray report, signed by Dr. Mitchell Sussman, stated incorrectly that the plaintiff had originally injured his arm one month prior, when in fact the original injury had occurred before March 2005. The report stated in relevant part:

> There are healing fractures involving the mid shafts of the radius and ulna. Alignment is good. The fractures are transfixed by metallic plate and screws. The plate transfixing the radius is mildly angulated. The radial fracture is comminuted[2] although unlikely, an acute component to the radial fracture is not entirely excluded. Correlation with previous films would be helpful for further evaluation.

6. Dr. Kayira wrote in his progress notes of August 16, 2005, that the plaintiff had recently had a fracture fixed, that no new soft tissue swelling was noted, and that the x-rays showed no new fracture. The plaintiff told Dr. Kayira that the original fracture had already healed completely before the plaintiff's incarceration, meaning that the "healing fractures" on

---

[2] Comminuted means "broken or crusted into small pieces". *Dorland's Illustrated Medical Dictionary (29th Ed.)*. Angulated means bent at an abnormal angle. *Id.*

2

the x-rays were actually new fractures, not "healing fractures" from the March 2005 surgery.[3] The plaintiff also gave Dr. Kayira the name of the surgeon who had performed the surgery and where it had been performed. Dr. Kayira's written plan was to return the plaintiff to housing for one month, with a low bunk permit. Dr. Kayira did not believe there was an immediate need to refer the plaintiff for further care at that time. Dr. Kayira avers that it was his "belief that Mr. Wilford's arm and bone would continue to heal so long as Mr. Wilford did not use his arm or further aggravate his problem. The fact that the plate had moved did not constitute a serious medical need nor an emergent condition at that time." (Kayira Aff. ¶ 15).

      7. Dr. Kayira next saw the plaintiff on September 1, 2005, for the plaintiff's complaints of pain. The plaintiff avers that his arm/wrist was still visibly deformed. Dr. Kayira wrote in his notes that no new soft tissue swelling was noted, that the plaintiff moved his fingers well, and that the x-rays showed a comminuted fracture with transfixing plate. Dr. Kayira's written plan was to obtain the records and x-rays from St. John's (where the surgery had been done) "to see if something new is going on." Dr. Kayira prescribed Motrin (which the plaintiff says did nothing for his pain) and extended the low bunk permit.

      8. Dr. Kayira avers that he wanted to review the prior medical records before making any further decisions. (Kayira Aff. ¶19). He does not say what steps, if any, he took to obtain the prior medical records, or whether he ever got the prior medical records.

      9. Dr. Kayira next saw the plaintiff on October 11, 2005, for the plaintiff's complaints of pain. The plaintiff told Dr. Kayira that the pain medicine was not working. Dr. Kayira noted the deformity of the plaintiff's right distal radius and ordered more x-rays. The radiology report states:

> Three views were obtained. There are plates and screws transfixing healing right distal radial and ulnar shaft fractures which appear in good alignment. The ulnar shaft fracture line is no longer visible and the radial fracture line remains visible without definite bridging callus noted at the fracture margins at this time. The radial fixation plate is somewhat bowed dorsally at the fracture level and there is mild dorsal angulation of these fracture fragments.
>
> SUMMARY: The transfixed right ulnar shaft fracture appears essentially healed. There is no bridging callus across the radial shaft transfixed fracture and there is some bowing at the fracture site and of the fixation plate as noted.

      10. Dr. Kayira next saw the plaintiff on October 28, 2005, for the plaintiff's complaints of pain. Dr. Kayira's note states that the plaintiff claimed that he fell in the shower and reinjured his arm, but the plaintiff admitted in his deposition that the only fall he had was in August 2005. The plaintiff would pretend he had fallen in order to avoid the $2 co-pay when he was running

---

[3] The court takes the plaintiff's account as true for purposes of this order.

low on funds. At this visit, Dr. Kayira noted a bowed deformity to the plaintiff's right arm. This time, Dr. Kayira's plan included referring the plaintiff out to an orthopod.[4] However, it is not clear whether this plan was implemented, as there is no referral in the record.

11. Dr. Kayira next saw the plaintiff on November 16, 2005, and noted the results of the last x-rays. Dr. Kayira noted bowing of the plaintiff's radial fracture site and fixation plate, and "significant dorsal convexity to distal fracture forearm." Dr. Kayira's plan was to "re-refer patient for approval to be seen by the operating orthopod." Dr. Kayira interprets this to mean that the first referral must have been denied, but there is no first referral in the record.

12. The plaintiff was sent to see Dr. Senica on December 6, 2005. The plaintiff avers that Dr. Seneca asked why the IDOC had waited so long and that his injuries had been left untreated for some time, but that is inadmissible hearsay.

13. Dr. Senica's report noted that the ulna was well healed, but that there was "obvious deformity and swelling . . . . in the forearm". Dr. Senica's report states in relevant part:

> I reviewed some x-rays dated October 11, 2005, . . . . His radial fracture appears to have gone to nonunion and he has a bent plate . . . . I also obtained some new films today. It shows that actually his plate is broken on the radius and he has a nonunion here. Hi ulna is completely healed. I reviewed his films that we had taken back in March and April 2005, when he made his first couple of follow-up visits and his fractures were anatomically reduced and in good position . . .

14. Dr. Senica's reports states that she told the plaintiff that another surgery was needed to remove the broken plate and screws.

15. It is not clear, but it appears that the plaintiff was scheduled for surgery with Dr. Senica on December 29, 2005, because the medical records note that Dr. Senica's office called to cancel the surgery on December 28, 2005. It appears that Dr. Senica decided to refer the patient to the SIU clinics. The plaintiff asserts this is because she determined that his case was too complex.

16. On January 17, 2006, Dr. Kayira prepared a request for the plaintiff to see Dr. McAndrew, an orthopedic surgeon with SIU School of Medicine in Springfield, Illinois.

17. The plaintiff saw Dr. McAndrew on January 17, 2006. Dr. McAndrew's report notes no swelling, and "apex dorsal right radius deformity." Dr. McAndrew's impression was "right diaphyseal radius hypertrophic nonunion with hardware failure." Dr. McAndrew recommended

---

[4]The plaintiff asserts that the only reason Dr. Kayira agreed to make the referral was because the plaintiff told Dr. Kayira that the plaintiff's mother had worked with Dr. Kayira at some point.

aspiration to rule out infection, and then removal of the broken hardware and bone grafting.

  18. Dr. McAndrew performed the surgery on February 16, 2006. The surgical report recounts a difficult and complicated surgery, due in part to the amount of scarring the fact that the plate was completely covered with bone.

  19. The plaintiff returned to Graham after his surgery. Dr. Kayira referred the plaintiff to Dr. McAndrew for the recommended follow-ups. The plaintiff's surgery appears to have worked; the plaintiff had an unremarkable post-surgery recovery. The plaintiff does have arthritic pain in his right wrist.

*Analysis*

  As an initial matter, it is clear that Wexford did not employ Dr. Kayira during the relevant period. Summary judgment is therefore mandated for Wexford. Additionally, Defendant Leigh, the x-ray technician, did not interpret any of the x-rays; all he did was position the plaintiff's arm and take the x-rays, and there is no evidence that he did so incorrectly, much less with deliberate indifference. Summary judgment will therefore be granted to Leigh.

  As to Dr. Kayira, the crucial time period is the approximately three months from the time of the injury (August 15, 2005) to the time of Dr. Kayira's request for a referral to Dr. Senica, on or around November 16, 2005. After that, the request was approved and the plaintiff saw Dr. Senica, who apparently scheduled and then cancelled surgery in favor of referring the plaintiff to Dr. McAndrew. Dr. McAndrew then saw the plaintiff and performed surgery. Thus, after the November referral, the plaintiff received the care he needed. In any event, there is no evidence that any delays after the November referral were attributable to Dr. Kayira.

  The plaintiff must therefore prove that Dr. Kayira's three month delay in referring the plaintiff to Dr. Senica amounted to deliberate indifference to the plaintiff's serious medical needs.

  It appears to the court that, from the first x-ray report, the plaintiff had a fractured radius and a somewhat bent plate. The court is no doctor, but the court wonders how a bent plate can heal itself. The bent plate (actually broken, but no one knew that at the time) and the radial fracture were confirmed by the October x-rays, as well as by the plaintiff's own accounts of obvious deformity, as well as the deformities noted in the medical records. According to the plaintiff, the deformity was so obvious that it became a running joke among inmates and staff. The court does not know whether this is true, but the court must accept the plaintiff's own description of what his arm looked like for purposes of summary judgment.

  The question is, was Dr. Kayira's three month delay, in the face of the x-ray and notable deformity, a "substantial departure from accepted professional judgment, practice, or standards as to demonstrate . . . [that he] did not base the decision on such a judgment." *Estate of Cole v. Pardue*, 94 F.3d 254, 261-62 (7th Cir. 1996); *see also Collingnon v. Milwaukee County*, 163 F.3d

982, 989 (7th Cir. 1998)(deliberate indifference may be established if "response so inadequate that it demonstrated an absence of professional judgment, that is, that nominally competent professional would not have so responded under the circumstances."). It may be that watchful waiting was within range of accepted professional judgment. If not, then the next question is, did the delay cause the plaintiff injury? *See Langston v. Peters*, 100 F.3d 1235, 1240-41 (7th Cir. 1996)(quoting with approval the Eighth Circuit in *Beyerbach v. Sears*, 49 F.3d 1324, 1326 (1996)(abrogated on other grounds in *Reece v. Groose*, 60 F.3d 487 (8th Cir. 1995)): "'An inmate who complains that delay in medical treatment rose to a constitutional violation must place *verifying medical evidence* in the record to establish the detrimental effect of delay in medical treatment to succeed.'"(emphasis in *Langston*)). The plaintiff does aver that he suffered pain and inability to use his arm, and perhaps the delay could have caused the surgery to be more risky and difficult, but there is no evidence of that.

The problem is, the plaintiff does not have a chance at answering these questions without an expert or affidavits from the plaintiff's treating surgeons. While an obviously bowed arm suggests to a layperson that treatment is needed, exactly what that treatment should be is not within a layperson's grasp.

The court believes that it should try to recruit counsel for the plaintiff in order to explore these questions. The court notes though, that even if the plaintiff can succeed in showing deliberate indifference by the three month delay, the damages available would likely be quite small, given the relatively short delay, the fact that the plaintiff did receive the surgery, and the lack of any hint that punitive damages might be warranted. Nevertheless, the court believes the record warrants trying to recruit counsel. Accordingly, Dr. Kayira's summary judgment motion will be denied and a Rule 16 hearing will be set, before which the court will try to recruit counsel. The court cannot guarantee it will be successful–the court cannot order an attorney to take the case.

As to Defendant Bryant, the Warden at Graham during the relevant time, he is not liable for Dr. Kayira's delay. The plaintiff avers that he personally confronted Bryant several times, showed Bryant his obviously deformed arm, and told Bryant that he was getting no treatment. An obviously deformed arm would suggest the need for treatment to a layperson. What that treatment should be, however, is not within the knowledge of a layperson. For example, a layperson would not know if a splint, sling, cast or surgery is the correct treatment. The grievance filed by the plaintiff in October 2005, states that x-rays had been compared , with "no apparent acute changes," an orthopedic referral had been granted and an appointment made. Bryant cannot be held liable for relying on this information, even if it incorrectly characterized what happened. *Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005)("If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands . . . Perhaps it would be a different matter if [non-medical staff] ignored [an inmate's] complaints entirely, but we can see no deliberate indifference [where the staff] investigated the complaints and referred them to medical providers. . .").

IT IS THEREFORE ORDERED:

1) The motion for summary judgment by Defendants Wexford and Dr. Kayira is granted in part and denied in part (d/e 47).  Summary judgment is granted to Wexford.  Summary judgment is denied for Dr. Kayira.

2) The motion for summary judgment by Defendant Leigh is granted (d/e 57).

3) The motion for summary judgment by Defendant Bryant is granted (d/e 54).

4) A Rule 16 conference is scheduled for May 8, 2009 at 9:30 a.m. by telephone conference.

Entered this 9th Day of March, 2009.

s\Harold A. Baker
_____
HAROLD A. BAKER
UNITED STATES DISTRICT JUDGE